**John R. TIPTON, Appellant,**

v.

**George E. STUART, Appellee.**

**No. 17311.**

Court of Civil Appeals of Texas, Fort Worth.

May 5, 1972.

Rehearing Denied June 2, 1972.

Hooper, Kerry & Chappell, and David F. Chappell, Fort Worth, for appellant.

Cantey, Hanger, Gooch, Cravens & Munn, and William B. David and Richard L. Griffith, Fort Worth, for appellee.

## OPINION

BREWSTER, Justice.

This is a suit for damages for personal injuries sustained by the plaintiff, John R. Tipton, when defendant's car in which plaintiff was riding as a passenger turned over while being operated by the defendant, George E. Stuart.

The trial was non jury and resulted in the trial judge rendering a take nothing judgment in favor of the defendant. This is an appeal by the plaintiff, Tipton, from that decree.

At plaintiff's request the court filed findings of fact and conclusions of law. The court therein found that defendant, Stuart, was negligent in that (1) he drove at an excessive speed, (2) he failed to keep a proper lookout, and (3) he was negligent in the manner in which he applied his brakes. Each such negligent act was found to be a proximate cause of plaintiff's injuries. No one questions on this appeal the court's findings and conclusions just mentioned relative to defendant's conduct.

The court also found that the plaintiff, Tipton, was guilty of contributory negligence upon the occasion in (1) failing to keep a proper lookout, (2) in failing to protest to defendant defendant's action in driving the car at the excessive speeds, and (3) in failing to leave defendant's car when he had an opportunity to do so after plaintiff first drove at the high speeds. The court found each such ground of contributory negligence to be a proximate cause of plaintiff's injuries.

Defendant had pleaded contributory negligence and the volenti doctrine as two separate and distinct defenses to plaintiff's suit.

Relative to the volenti non fit injuria defense the court found (1) plaintiff knew

defendant was driving his car at a negligent rate of speed, (2) he knew and appreciated the fact that riding in a car traveling at a high rate of speed was dangerous to his own welfare, and (3) that plaintiff voluntarily exposed himself to the risks involved in riding in the car being driven at those high rates of speed.

The court concluded that because of these findings the plaintiff was barred from recovering from defendant for two reasons, namely, (1) the volenti non fit injuria doctrine and (2) contributory negligence.

On this appeal the plaintiff urges only two points of error, same being that (1) as a matter of law the volenti doctrine did not bar plaintiff from recovering in this case and (2) that there was both no evidence and insufficient evidence to support the court's findings of contributory negligence and proximate cause.

If the evidence supported the court's findings on any one of the acts of contributory negligence then we will be required to affirm this case. This is true because a single act or omission of contributory negligence by plaintiff would be a bar to a recovery by him in this case.

Independent of the contributory negligence feature, if the volenti doctrine is applicable in this case as was held by the trial court, then that doctrine alone would be a complete defense to plaintiff's case.

So in order to get a reversal of the judgment appealed from it is necessary that appellant succeed in showing that the trial court erred in all of the three instances wherein he found that plaintiff committed contributory negligence that proximately caused his injuries and also in his holding that the plaintiff was barred from a recovery by the volenti doctrine.

We affirm the trial court's judgment because we are convinced that its findings on contributory negligence and proximate cause with respect to at least two of the grounds of contibutory negligence are fully supported by the evidence.

Testimony that is material to a decision of the case that was given by plaintiff during the trial is outlined in the next paragraph.

On November 19, 1970, Tipton had tuned the defendant, Stuart's Dodge Charger automobile for him. To see if the car had been tuned properly it was necessary to road test it, and the tuning job was not complete until after the road test had been made. At 8 P. M. that evening, at a time when it was very dark, Stuart, Tipton, and a friend of theirs got into the car and started out to road test it. Stuart was driving his car. Tipton was in the front seat where he could listen to the motor, and Maillet, their friend, rode in the back seat during the road test. Plaintiff knew, before getting into the car to go road test it, that during the test it would be driven at speeds between 70 and 85 miles per hour. Enroute to go road test the car they stopped and each had one beer. They drove several blocks to get on Loop 820. They then traveled 10 to 12 miles on Loop 820 and while on it got the car up to 85 miles per hour at one point. Plaintiff had engaged in racing cars since 1963. Stuart drove the car on Loop 820 for about one-half a mile at a speed of 80 to 85 miles per hour. Plaintiff was familiar with cars traveling at high speeds so it did not necessarily frighten him to go that fast. He knew that when a car traveled between 75 and 85 miles per hour that the faster you went the less control the driver would have over his car. He also knew that if one had a blowout or if something suddenly appeared in front of him that the faster the car is going that the less chance the driver would have to prevent an accident. Knowing these things, he still did not protest to defendant about driving the car at these high speeds at any time while on Loop 820. Sixty-five to seventy miles per hour was the speed limit on Loop 820. Stuart then drove the car onto Trinity Boulevard and after making the first sweeping curve there, he accelerated the speed in order to burn the carbon off the spark plugs. This involved mashing the accelerator to the floorboard and going at a fast rate of speed that plaintiff estimated at 80 to 85 miles per hour. They traveled about four miles on Trinity Boulevard before the wreck and this high speed was maintained there for about one-fourth of a mile. At this point defendant then slowed the car to 65 to 70 miles per hour. On Trinity Boulevard the speed limit was 50 miles per hour. They then suddenly came to an "S" curve. On this curve was a sign saying the speed limit was 35 miles per hour. Plaintiff said that with his experience as a racing driver he could have negotiated the curve at 60 miles per hour. In the curve Trinity Boulevard narrowed from four lanes down to two lanes. Plaintiff was not looking ahead so he did not see the speed sign or the narrowing of the road sign. The area involved was pitch black as there were no street lights. The car went into the curve going 65 to 70 miles per hour. Neither plaintiff nor defendant were familiar with the road at the point where this curve was located. Before the wreck defendant advised plaintiff he was not familiar with the road. Defendant lost control of his car while trying to negotiate this curve and it turned over. Plaintiff was hurt in the ensuing one-car wreck. Plaintiff testified that Stuart, prior to the wreck and while on Trinity Boulevard, went through two street intersections at which flashing red lights were located and that he did not slow down at either intersection and plaintiff then became apprehensive about the way defendant was driving. Plaintiff never asked at any time to get out of the car while on Trinity Boulevard. There was another sign in the curve in question that said "Road Narrows" but he did not see it that night because he was not looking ahead. There are no obstructions at the curve that would prevent one from seeing the area surrounding the curve. As they approached the wreck scene plaintiff was not looking ahead of the car or paying attention. They were upon the curve before plaintiff realized it was there. He saw the curve about the same time Stuart saw it.

Material testimony as given by defendant, Stuart, is outlined in the next paragraph.

Plaintiff never at any time during the entire road test asked defendant to slow down or protested the high speeds at which defendant was driving. Defendant did not see either the 35 mile per hour speed limit sign or the "Road Narrows" sign which were located at the "S" curve where the wreck occurred. He was not familiar with this part of the road and did not know the signs were there. Before coming to the curve the speed limit was 50 miles an hour on Trinity Boulevard. He knew that. His car left the road about one block past the 35 mile an hour speed limit sign. *If he had seen this sign or known that the curve was there he could have stopped his car before it left the road going at a speed of 60 to 65 miles an hour.* He did not jam his brakes before the collision. He was going about 35 miles an hour more than the posted speed limit at the curve when he left the road. He did not see the curve until he was right on it.

The other passenger, Maillet, testified that after getting onto Trinity Boulevard and before the wreck the defendant, Stuart, drove through two street intersections where there were red blinking traffic control lights operating, and that Stuart did not slow down his car before driving through either of those intersections.

The witness, J. D. Powers, a city policeman who investigated the wreck testified: there are no obstructions at the scene to block one's view of the 35 mile an hour speed limit sign or of the "Road Narrows" sign; it is between 1300 to 1500 feet from the 35 mile an hour sign to the point where the car left the road; in his opinion one can make the curve all right going at 65 miles an hour without any strain; the defendant, Stuart, told him at the scene that he was driving about 85 miles an hour when he came onto the curve which he did not see in time and just lost control of his car.

The parties stipulated that after the wreck one Bob Hudson took a Dodge Charger auto similar to that of Stuart's to the curve where the wreck occurred and made some tests. He was able to negotiate the curve in this car while knowing the curve was there, while the car was going at 75 miles per hour. He kept the car in this proper lane during this time. At 60 miles an hour he could stop the car in 170 feet. At 65 miles an hour he could stop within 280 feet. At 70 miles an hour it took 332 feet to stop the car and at 80 miles an hour it could be stopped in 476 feet. These tests were made in the daytime and when the driver knew he was going to have to stop.

■ We will discuss plaintiff's second point relating to the contributory negligence findings. We overrule that point.

The attack made on such findings is that there is both no evidence and insufficient evidence to support the court's findings as to contributory negligence and proximate cause and that as a matter of law plaintiff was under no duty to keep a proper lookout or to protest defendant's conduct in operating the car at high speeds upon the occasion in question. In considering this point we have reviewed the entire record.

### Proper lookout

■ The general rule is that a passenger is not required to keep a proper lookout and he is entitled to trust to the vigilance and skill of the driver.

However, the rule is different in instances where from the manner in which the car is being driven upon the particular trip in question the passenger is made aware that the driver is likely to be inattentive or careless. Under such circumstances the passenger does have a duty to keep a proper lookout. Ellis v. Guinn, 323 S.W.2d 381 (El Paso, Tex.Civ.App., 1959, ref., n. r. e.); Thweatt v. Ocean Accident & Guarantee Corporation, 62 S.W.2d 250 (El Paso, Tex.

Civ.App., 1933, writ ref.); Texas Mexican Ry. Co. v. Hoy, 24 S.W.2d 18 (Tex.Com. App., 1930), and Edmiston v. Texas & N. O. R. Co., 135 Tex. 67, 138 S.W.2d 526 (Tex.Com.App., 1940).

We hold that under the exceptional circumstances of this case the trial court was justified in concluding that the plaintiff passenger was under a duty to keep a proper lookout for his own safety. Here the evidence showed that shortly prior to the wreck plaintiff had been made aware of the fact that the driver was not familiar with the road on which the car was being driven at speeds of up to 85 miles an hour, and that the driver probably was not keeping a lookout because he had shortly before the wreck seen this driver go through at least two street intersections that were controlled by blinking red traffic lights without even slowing down. The night was pitch black and the road was unlighted. The plaintiff passenger was aware of the dangers of operating the vehicle at high speeds.

The plaintiff admitted that he was not looking ahead or paying attention on the occasion when they came to the curve where the car turned over. He was engaged in listening to the engine.

This evidence, together with that above outlined, was more than sufficient to support the trial court's finding that plaintiff owed a duty to keep a proper lookout upon the occasion in question and that plaintiff breached that duty.

We also hold that the evidence offered was more than sufficient to support the trial court's finding that the plaintiff's failure to keep a proper lookout was a proximate cause of his injuries.

The plaintiff and the police officer both testified that the curve in question could be safely driven without any strain at about 60 or 65 miles an hour. The evidence showed that there were no obstructions at the scene to block one's view of the curve as it was being approached by the parties,

if they were in fact keeping a lookout. The court could reasonably conclude from the evidence that had plaintiff been keeping a proper lookout that he would have seen the curve in time to warn the driver of its presence soon enough that he could have either stopped his car before it left the road or that he could have slowed it enough to where he could have safely negotiated the curve.

### Failure of passenger (plaintiff) to protest to driver his conduct in driving at an excessive speed

■ A passenger in an automobile is under a duty to exercise the degree of care that an ordinarily prudent person would exercise under the same circumstances. The discharge of that duty does not require the passenger to constantly watch the speedometer to see if the driver is exceeding the speed limit. But if the driver operates the car at a speed that is so great, under the circumstances then prevailing, that a reasonable man would realize its excessive character, the passenger then has the duty to call the driver's attention to such speed and to protest the act of the driver in operating the car at such excessive speed. See Edmiston v. Texas & N. O. R. Co., 135 Tex. 67, 138 S.W.2d 526 (Tex. Com.App., 1940).

We hold that the evidence outlined above was more than sufficient to support the trial court's conclusion that the speeds at which the driver was operating his car under the conditions then existing were such as to make it the duty of the plaintiff passenger to protest such speeds to the driver. The defendant, driver, testified that plaintiff in no way protested to him the speed at which he was traveling at any time during the entire trip. We also hold that there was sufficient evidence to support the trial court's findings of negligence and proximate cause in so far as this ground of contributory negligence is concerned.

Cases supporting the conclusion that we have reached are Copeland v. Ogle, 372

S.W.2d 731 (Amarillo, Tex.Civ.App., 1963, ref., n. r. e.); Murphy v. Milheiser, 30 S.W.2d 586 (Galveston, Tex.Civ.App., 1930, writ ref.) (car operated at an 80 mile an hour speed), and Texas Mexican Ry. Co. v. Hoy, 24 S.W.2d 18 (Tex.Com.App., 1930).

It appears to us that it would have been safer to engage in a game of Russian roulette than to have voluntarily participated in what the parties here did upon the night in question. The trial court was justified from the evidence in concluding that they had just shortly before the collision at high speeds "barrelled" through at least two intersections that were protected by flashing red signal lights without even slowing down. The plaintiff saw that and became apprehensive. The plaintiff proved by the police officer who investigated that the driver admitted at the scene that he was traveling 85 miles an hour when he came upon the curve in question and the evidence showed that prior to this time plaintiff had been advised that the driver was not familiar with the dark and unlighted road they were traveling, and that with all this knowledge the plaintiff did not even keep any lookout ahead at all and there was evidence to the effect that he never at any time during the entire trip protested the driver's conduct in driving at such high speeds.

In Texas Mexican Ry. Co. v. Hoy, supra, at page 20, the court said: ". . . if he (speaking of a passenger) sits by without warning or protest, and knowingly permits himself to be driven carelessly to his injury, he should be held guilty of contributory negligence." Again at page 20 the court said: "If he was willing under the circumstances to remain silent and take such a chance, he ought to be required to do so at his own risk . . . . ."

The holding that we have made above on the contributory negligence feature of the case disposes of this entire appeal. If upon the occasion in question plaintiff committed just one act of contributory negligence that proximately caused his injuries he is thereby barred from recovering in this case.

We are so firmly convinced that the evidence raised fact issues as to the contributory negligence and proximate cause issues above discussed that we will refrain from discussing the plaintiff's remaining point of error No. 1. Even if we sustained that point relating to the contention that the volenti doctrine was not applicable to the facts of this case, it would not affect the outcome of this appeal.

We will therefore not discuss plaintiff's first point and thereby add to the length of this opinion, because, regardless of how we decided it, we would still be required to uphold the judgment in favor of defendant because of plaintiff's contributory negligence.

The judgment is affirmed.